Filed 10/4/16  Certified for Partial Publication 11/2/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>DIANE C. ASBURY,<br><br>     Defendant and Appellant. | B255953<br><br>(Los Angeles County<br>Super. Ct. No. MA052970) |
| In re DIANE C. ASBURY,<br><br>     on Habeas Corpus. | B269063 |

APPEAL from an order of the Superior Court of Los Angeles County.  Charles A. Chung, Judge.  Reversed with directions.

ORIGINAL PROCEEDING; petition for writ of habeas corpus.  Petition denied.

Law Offices of Dennis A. Fischer, Dennis A. Fischer and John M. Bishop for Defendant and Appellant in No. B255953.

James H. Barnes for Petitioner in No. B269063.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson, and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent in No. B255953 and Respondent in No. B269063.

_____

Appellant Diane C. Asbury challenges her conviction for the murder of her former longtime boyfriend Anthony Simiele. Simiele came to Asbury's house to reclaim some belongings he had left in her garage. They argued, and when he followed her upstairs to her bedroom, she pulled out a handgun she kept near her bed and shot him. Asbury raises several challenges to her conviction, both on direct appeal and in a petition for a writ of habeas corpus. We reverse her conviction on the ground that the trial court erred by refusing to instruct the jury regarding voluntary manslaughter under a heat of passion theory. We deny the petition for a writ of habeas corpus.

## FACTS AND PROCEEDINGS BELOW

Asbury and Simiele had been in a relationship for most of 26 years and lived together for 20 of those years. They never married, but Simiele was the father of Asbury's 23-year-old daughter Victoria. Although they had previously had several brief separations over the years, the couple broke up permanently in October 2010, when Simiele moved out of the house Asbury owned. Asbury had suffered from breast cancer and depression, and she believed Simiele had not done enough to take care of her when she was sick.

According to Mary Huang, Simiele's girlfriend of three months, on April 24, 2011, Asbury went to Simiele's house unannounced, arriving as they were about to eat Easter dinner. Simiele invited Asbury into the house and introduced her to Huang. When Huang told her she had been dating Simiele for a few months, Asbury became visibly angry. Simiele and Asbury argued about their bills and mortgage, and about their daughter Victoria. Asbury admitted that at one point, she called Huang a "f-ing C" and told her to "wait until you have cancer." According to Huang, Simiele accused Asbury of having held a gun to Victoria's head when Victoria was sick, and then to her own head. Asbury did not respond to the accusation. Huang testified that Asbury did not appear to be afraid of Simiele. According to Asbury, after this incident, her depression worsened, and she could not stop crying.

Asbury's friend Patricia Love testified that Asbury told her about the Easter confrontation. In their daily conversations, Asbury often told Love that she was upset

2

that Simiele had a new girlfriend, and sometimes told her that she was upset that she was no longer with Simiele. Asbury later told police that she was ambivalent about whether she wanted to get back together with Simiele. Asbury told Love that she drove past Simiele's house looking for Simiele's and Huang's cars. Love cautioned Asbury to stop and believed Asbury was obsessed about Simiele and Huang's relationship. Love told Asbury it was not a good idea for Asbury to keep a gun in her home, but Asbury told her that she needed the gun in case Simiele ever attacked her. Asbury did not tell Love that Simiele had ever attacked her in the past, but she did tell Love that Simiele had once threatened to "call [her] out" in front of their peers and friends, and that he had once headbutted their daughter. Asbury later told police that Simiele had screamed at her, slammed tables, and threatened their daughter Victoria. Although he had once hit her when she threatened to have an abortion, Asbury admitted that he had not been violent toward her recently.

According to Asbury, she and Simiele, along with Victoria, attended a wedding in San Francisco in early May 2011. Asbury became upset because she thought Simiele was monopolizing Victoria.

Asbury gave the only account of what happened on the day of the shooting. She told police that Simiele called her to arrange to pick up possessions he had left in her garage. Because Asbury worked at night and would be sleeping during the day on Sunday, she requested that he come on Monday. He agreed. Simiele came to Asbury's house on the afternoon of Sunday, May 29, 2011, and banged on the door until Asbury let him in. They argued. According to Asbury, Simiele picked up a hammer from the floor, saying it belonged to him. Asbury told Simiele she was going to bed, and he should not follow her. In spite of this request, Simiele followed her upstairs, saying he had a right to do so. When police later searched Asbury's residence, the only hammer they discovered was a sledgehammer on the lower level of the house. Asbury did not remember seeing it when Simiele went upstairs. Asbury told Simiele to leave, but he stayed in the room and kept yelling at her. Simiele told Asbury that if she wanted to confront him again, she should bring her "tough guy friends." Asbury picked up the handgun she kept by her bed

3

and told Simiele to leave.  Asbury told friends that she kept a gun in her house for protection, including from Simiele.  She had owned the gun for approximately 20 years, and had bought ammunition for it only about a month earlier.  Asbury had suffered from breast cancer, and had surgery for a double mastectomy.  This surgery had compromised her strength, and at the time of the shooting, she struggled when trying to lift 25 pounds.  Simiele took one step toward Asbury, and she felt afraid that he was going to attack her and strangle her.  She fired the gun.  According to a firearms expert, Asbury fired this shot at a distance of approximately four feet away from Simiele.  The bullet traveled upward from the gun, but it exited Simiele's body at a lower point than where it entered.  The expert concluded from this that Simiele was either leaning forward toward Asbury or covering his face with one leg off the ground, shielding himself from the bullet.  The bullet struck Simiele on the left side of his torso, below his ribs.

Simiele jumped at Asbury and tried to wrestle the gun away from her.  In the process, he fell on top of Asbury.  She fired the gun again.  A firearms examiner testified that the trajectory analysis indicated that Asbury had fired this second shot with the gun resting against her thigh, and that the bullet had traveled through her pants at an upward angle.  According to the examiner, this was consistent with Asbury lying on her back and struggling over the weapon with Simiele.

Asbury called 911 on her cell phone and started performing CPR.  She ran down the stairs, put the gun in a pile of laundry, and ran out of the house.  She told the 911 dispatcher that Simiele had come to her house and started attacking her, and so "I got my gun and I shot him."

Police officers and paramedics appeared on the scene, but they were unable to save Simiele's life.  Asbury's only injuries were a bruise on her leg and a scratch on her wrist.

After the shooting, police officers searched Asbury's cell phone.  They found a picture of Simiele's truck and another of a firearms range target.  In approximately 1,200 text messages between Asbury and her daughter Victoria, there was no mention of any headbutting or other act of violence by Simiele to Victoria, nor any warning from

4

Asbury that Simiele might be dangerous. Phone records showed that Asbury had called Simiele on seven days in April and May, including the day before the shooting, and that Simiele had called Asbury twice the day before the shooting.

An information charged Asbury with one count of murder, in violation of Penal Code section 187, subdivision (a),[1] with an allegation that Asbury personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (c)-(d)), and that she personally used a firearm. (*Id.*, subd. (b).)

A jury found Asbury not guilty of first degree murder, but guilty of second degree murder. The jury also found true the allegation that Asbury discharged a firearm. The trial court sentenced Asbury to 15 years to life imprisonment for second degree murder, plus a mandatory consecutive term of 25 years to life for the enhancement, for a total term of 40 years to life in prison.

**DISCUSSION**

We address Asbury's direct appeal and her petition for writ of habeas corpus together in a single opinion.

I. *The Direct Appeal*

Asbury raises several claims on appeal. She contends that the evidence proved as a matter of law that she killed Simiele in a heat of passion, and that consequently there was insufficient evidence to support a murder conviction, as opposed to voluntary manslaughter. Alternatively, she argues that the trial court erred by refusing to instruct the jury regarding a heat of passion theory of voluntary manslaughter. Next, she contends that the trial court undermined the integrity of her trial by severely limiting voir dire. Next, she contends that the trial court erred by denying her motion for a new trial made on the ground that her attorney provided ineffective assistance of counsel by failing to investigate and present expert testimony regarding intimate partner battering. Finally, she contends that the prosecution committed misconduct during closing

---

[1] Unless otherwise specified, subsequent statutory references are to the Penal Code.

5

argument by misstating the burden of proof beyond a reasonable doubt. We agree with Asbury's argument regarding jury instructions, and we reverse her conviction.

### A.    *Heat of Passion Instruction*

Asbury contends that the trial court erred by refusing her request for a jury instruction on a heat of passion theory of voluntary manslaughter. We agree.

Asbury's counsel requested that the trial court instruct the jury on voluntary manslaughter under theories of imperfect self-defense and heat of passion. The court agreed to the imperfect self-defense instruction, but declined to instruct the jury on a heat of passion theory. The court stated, "it appears from the defendant's testimony that there was this ongoing argument but it also seems to be a continuation of a long-term argument that had been going on between them for months. There doesn't seem to be anything that is a true heat of passion on the part of the defendant where she was overcome by a certain emotion and acted under that emotion or a sudden quarrel."

Voluntary manslaughter is a lesser-included offense of murder, in which the defendant kills the victim without malice. (Pen. Code, § 192, subd. (a).) A defendant may commit voluntary manslaughter rather than murder if she kills "upon a sudden quarrel or heat of passion." (*Ibid.*) "The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. . . . '[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believes that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252–1253.) Nevertheless, although there is an objective component to the heat of passion requirement, "in California the law of provocation focuses on ' "emotion[al] reasonableness" ' (i.e., 'whether "the defendant's *emotional* outrage or *passion* was reasonable" '), not on ' "act reasonableness' " (i.e., 'whether "a

6

reasonable person in the defendant's shoes would have responded or *acted* as violently as the defendant did." ')" (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1481–1482.)

The trial court has an obligation to instruct the jury "on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present." (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) "[I]n a murder prosecution, this includes the obligation to instruct on every supportable theory of the lesser included offense of voluntary manslaughter, not merely the theory or theories which have the strongest evidentiary support, or on which the defendant has openly relied." (*Id.* at p. 149.)

"We review de novo a trial court's failure to instruct on a lesser included offense." (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137 (*Millbrook*).) In so doing, "we review the evidentiary support for an instruction 'in the light most favorable to the defendant' [citation] and should resolve doubts as to the sufficiency of the evidence to warrant instructions ' "in favor of the accused." ' " (*People v. Wright*, *supra*, 242 Cal.App.4th at p. 1483.)

In this case, there was sufficient evidence of both objective provocation and Asbury's subjective emotion to warrant a heat of passion instruction. Asbury stated that Simiele had treated her badly for years, belittling her cancer diagnosis and demanding oral sex from her when the breast cancer had debilitated her. The bad blood between the couple increased shortly before the shooting. According to Asbury, the couple feuded at a wedding a few weeks before the shooting, and Simiele told her that he was not going to do what she wanted, and that she should "get some tough guy friends and meet him on the street." Asbury's friend Love confirmed this account, testifying that Asbury told her that Simiele had threatened her. The provocation for a heat of passion instruction need not happen at once, but may be created "by a series of events over a considerable period of time." (*People v. Borchers* (1958) 50 Cal.2d 321, 328.) By Asbury's account, these provocations came to a head on the day of the shooting. Simiele came to Asbury's house unannounced, at a time when Asbury had told him she would be sleeping, and that he should not disturb her. He banged on the door repeatedly until Asbury answered. Then

he rejected her requests to leave, picked up a hammer and continued hectoring her as he stalked around the room. When Asbury went up to her bedroom, Simiele followed her and continued berating her. If we assume, as we must for this purpose, that Asbury's testimony was true, Simiele's behavior was not enough to drive an ordinary person to kill, but it was enough to create intense emotion in a reasonable person in Asbury's position. (See *People v. Wright*, *supra*, 242 Cal.App.4th at pp. 1481–1482.) Love's testimony about Asbury's reactions to Simiele's previous provocations would support a jury's inference that Asbury would have reacted with extreme emotion to Simiele's behavior, and that this was what caused Asbury to shoot Simiele.[2]

The Attorney General contends that reversal of the murder conviction is not required because the instructional error was harmless. In general, we review claims of instructional error according to the standard established in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), under which reversal is not appropriate "unless it appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred." (*People v. Breverman*, supra, 19 Cal.4th at p. 149.)[3]

The Attorney General contends that the error here was harmless because the jury, in convicting Asbury for murder, necessarily rejected her claims that she acted in reasonable or unreasonable self-defense. But, of course, a claim of self-defense is not the

---

[2] Although there was sufficient evidence for a jury to infer that Asbury had been in a heat of passion when she shot Simiele, the jury was not required to draw that inference. For this reason, Asbury's claim that there was insufficient evidence of malice to support a second degree murder conviction fails. (See *People v. Bolin* (1998) 18 Cal.4th 297, 331 [Reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' "].) On remand, the prosecution may, if it chooses, retry Asbury on the murder charge.

[3] In *Millbrook*, *supra*, 222 Cal.App.4th 1122, the Court of Appeal noted that there was some authority for reviewing a trial court's failure to instruct the jury on a lesser-included offense as an error implicating the defendant's federal constitutional rights, under which an error is harmless only if it appears beyond a reasonable doubt that the error did not contribute to the verdict. (*Id.* at pp. 1145-1146.) Because we, like the court in *Millbrook*, conclude that reversal is required even under the more stringent *Watson* standard, we need not decide this issue. (See *id.* at p. 1146.)

same as a defense based on acting in a heat of passion. It is entirely possible that the jury believed that Asbury was in a state of extreme agitation when she shot Simiele, but because there was no heat of passion instruction, the jury did not consider convicting her of voluntary manslaughter rather than murder on that basis. Indeed, in closing arguments, the prosecution argued that Asbury was "angry" at the time of the shooting, and that Simiele had been "demeaning," "belittling," and "mocking" her. The Attorney General points out that the prosecution's argument does not constitute evidence. But the prosecution's comments demonstrate how plausible it was that, according to the evidence the prosecution did present, Asbury shot Simiele in a state of extreme emotion, as a consequence of Simiele's provocation.

" ' "An appellate court is not restricted to the remedies of affirming or reversing a judgment. Where the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial." ' " (*People v. Thomas* (2013) 218 Cal.App.4th 630, 647.) On remand, therefore, the prosecution shall have the option to retry Asbury for second degree murder, or to accept a modification of the judgment to reflect a conviction for voluntary manslaughter. If the prosecution elects to accept the modification of the judgment, the trial court shall resentence Asbury in accordance with the modified judgment.

B.      *Limitations on Voir Dire*

Asbury contends that the trial court abused its discretion by limiting the time for her trial counsel to only 25 minutes of voir dire, with no extensions available for further questioning of potential jurors. Even if the court erred in so limiting the questioning, we nonetheless hold that Asbury is not entitled to reversal of her conviction because she has not shown that, as a result of the limitation, her trial was fundamentally unfair.

1.      *Proceedings Below*

Prior to jury selection, the trial court informed the parties how it intended to conduct voir dire. The court planned to ask the prospective jurors to answer a written questionnaire featuring 20 questions about their backgrounds, prior experiences with

9

the legal system, their attitudes toward law enforcement, and their personal beliefs.**4**

The court did not give the parties an opportunity to submit additional questions to supplement the questionnaire. The court allotted 20 minutes to each side for questioning jurors, including alternates, with no additional time provided depending on the number of potential jurors called. When jury selection began, the court called the first 12 potential jurors to the jury box and asked each to state his or her area of residence, occupation, marital status, spouse's occupation, number of children, and prior experience serving on juries. The court also asked each potential juror if he or she had responded "yes" to any of the questions on the questionnaire regarding personal experience with the justice system, attitude toward law enforcement, personal beliefs, and other similar issues.**5** In any case of a "yes" answer, the court asked each juror to explain the answer briefly. As this process went on, the court asked some of the jurors follow-up questions regarding their answers.

Once the court had finished, Asbury's counsel and the prosecution took their turns questioning the first group of 12 potential jurors. Next, the parties began exercising peremptory challenges. After each peremptory challenge, the court replaced the juror who had been excused with one replacement, and proceeded with voir dire of that new juror, asking him or her about any "yes" answers to the questionnaire, and asking follow-up questions. Asbury's attorney requested that, as a part of the court's own questioning of these new additions to the panel, the court ask each new prospective juror if he or she would have responded in the affirmative to any of the questions the lawyers had asked earlier.**6** The court granted that request. Asbury's attorney ran out of time after using

---

**4** The full text of the trial court's questionnaire is attached to this opinion as Exhibit A.

**5** These were questions 6 through 20 in the court's questionnaire.

**6** During voir dire, Asbury's counsel had asked the jurors as a group the following questions: "[Is] anybody here . . . a member of the NRA?" "Is there anybody who is a member of [a] gun control organization, where they don't believe in guns?" "Is there anybody here because of the nature of the charges who feels that this is something they really—they would rather be on a drug case or they'd rather be on a DUI case?" "Is there

10

only four of his 20 peremptory challenges. At this point, the court informed defense counsel that he had already used 25 minutes questioning jurors, and that he would not be permitted to ask further questions on voir dire unless "something explosive comes up." The court also denied defense counsel's request to submit follow-up questions for the court to ask. Counsel did not specify the questions, their substance, or subject matter.

The court then continued questioning each new potential juror one at a time, in the same manner as before. Pursuant to the request from Asbury's attorney, the court also asked each prospective juror if he or she would have responded in the affirmative to any of the questions the lawyers had asked earlier. On one occasion, a prospective juror answered that her husband was a member of the NRA. The trial court did not ask any follow-up questions in response. The defense exercised two more peremptory challenges, and the prosecution exercised one. When the court placed new jurors to replace those who had been excused, defense counsel had some opportunity to question the new jurors through the court's asking whether the juror would have answered any of the attorney's questions to the panel in the affirmative. During trial, one juror was excused from service and replaced by an alternate, leaving four jurors on the panel whom the defense had not directly questioned.

---

anybody who disagrees with that . . . statement that . . . we decide a case on its facts and we look at each fact and try and place it in the context of the law?" The prosecutor asked the following questions of the jurors as a group during voir dire: "Does anybody think that because it is a woman defendant and a male victim that she is less likely to be guilty?" "[D]oes anybody think that because the defendant is a woman and the victim is a man that there is a stronger likelihood that self-defense is involved?" "Does anybody here think that if somebody is in your house you automatically have the right to use deadly force against them because they are in your house?" "Does anybody here have any issues or strong feelings about domestic violence, . . . one way or the other, whether the victim is a man or a woman?" "Does anything about [Asbury's] appearance make you think that she is less likely to be guilty?"

11

## 2.    *Discussion*

Although the issue is a close one,[7] given all the circumstances, Asbury is not entitled to a reversal.  Code of Civil Procedure section 223 provides that "[t]he trial court's exercise of its discretion in the manner in which voir dire is conducted, including any limitation on the time which will be allowed for direct questioning of prospective jurors by counsel . . . , shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."  Although the "miscarriage of justice" standard is often equated with the "reasonable probab[ility]" test our Supreme Court established in *Watson*, *supra*, 46 Cal.2d at p. 836, this is not universally the case:  "[T]he *Watson* decision did not purport to overrule or disapprove that portion of the [*People v. O'Bryan* (1913) 165 Cal. 55] decision recognizing that with regard to *some* errors—such as a denial of the right to jury trial—a 'miscarriage of justice' would result from the denial of the right itself, without regard to the state of the evidence."  (*People v. Cahill* (1993) 5 Cal.4th 478, 492.)  Thus, in reviewing trial court decisions regarding jury selection, courts have not attempted to evaluate whether the defendant would have likely obtained a better outcome at trial in the absence of the error.  Instead, they have examined whether the trial court's error "affected [the defendant's] right to a fair and impartial jury." (*People v. Yeoman* (2003) 31 Cal.4th 93, 114 [holding that the trial court's error in depriving defendant of peremptory challenges was harmless because no incompetent juror sat on the panel].)

Courts have reviewed cases involving restrictions on voir dire in this manner. In *People v. Holt* (1997) 15 Cal.4th 619, our Supreme Court held that in order for reversal to be appropriate, "the voir dire by a court [must have been] so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair."

---

[7] Although it is impossible to state an absolute rule regarding the minimum amount of time a trial court must provide for voir dire, it would be a better practice, at least when allowing a relatively short time for voir dire, to establish only a presumptive time limit and allow additional questioning upon a showing of good cause.

(*Id.* at p. 661, citing *Mu'Min v. Virginia*, *supra*, 500 U.S. at pp. 425–426.) The court in *People v. Chapman* (1993) 15 Cal.App.4th 136 described the standard for reversal in more concrete terms: " '[W]here . . . the trial judge so limits the scope of voir dire that the procedure used for testing does not create any reasonable assurances that prejudice would be discovered if present, he commits reversible error.' " (*Id.* at p. 141.)

There is no indication in the record that the court's limitation on voir dire resulted in a fundamentally unfair trial. Nothing in the record shows that any of the jurors were actually biased, and Asbury does not point to anything in the record suggesting that further questioning of a particular juror was necessary. Further, the trial court's questionnaire and follow-up questions to the individual jurors tested most of the common ways in which a prospective juror might be too biased to serve. Asbury points out that the questionnaire was not exhaustive and did not include all of the suggested areas for questioning included in the Judicial Council's Standards for Judicial Administration. But those standards are only "recommended," not mandatory for trial courts to follow in every detail. (*People v. Bolden* (2002) 29 Cal.4th 515, 538.) Furthermore, the court's questionnaire in this case covered most of the areas described in the Judicial Council's standards, and most of the omissions and alterations from the standards were relatively minor.

The one area in which the trial court's questionnaire differed from the Judicial Council's standards in a significant way was with respect to race. The Judicial Council recommends that trial courts ask, where appropriate, "[i]t may appear that one or more of the parties, attorneys, or witnesses come from a particular national, racial, or religious group (or may have a lifestyle different from your own). Would this in any way affect your judgment or the weight and credibility you would give to their testimony?" (Cal. Stds. Jud. Admin., § 4.30, subd. (b)(20).) Asbury contends that her conviction must be reversed because the trial court did not ask jurors about their attitudes toward issues of race. Asbury is ethnically Chinese and speaks with an accent, while Simiele was Caucasian. "In a case involving an interracial killing, . . . a trial court during general voir dire is required to question prospective jurors about racial bias *on request*."

(*People v. Bolden*, *supra*, 29 Cal.4th at p. 539, citing *Turner v. Murray* (1986) 476 U.S. 28, 36-37.)

Asbury's attorney did not request that the trial court ask potential jurors about their attitudes toward race. Asbury argues that such a request was not necessary because it would have been futile (see *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 648), in that the trial court made clear that it would not allow the parties to request additions to the questionnaire. But the trial court granted Asbury's counsel's request that the court ask new prospective jurors if they would have responded in the affirmative to any of the questions Asbury's attorney had asked other jurors. If counsel had explained the relevance and what the standards recommend, it is not at all clear that the court would have denied the request. Most importantly, appellant has not demonstrated that questions on the subject were necessary in this particular case. Indeed, Asbury's attorney, in his judgment regarding the issues most important to the case, did not ask a single question regarding race to any of the prospective jurors during his 25 minutes of voir dire. If race was an important consideration, we would expect that he would have done so.

Asbury also argues that her conviction must be overturned because the trial court's imposition of a blanket time limit on voir dire was per se improper. She cites Code of Civil Procedure section 222.5, which provides that "[s]pecific unreasonable or arbitrary time limits shall not be imposed in any case. The trial judge shall not establish a blanket policy of a time limit for voir dire." By its own terms, however, that code section establishes rules "[t]o select a fair and impartial jury in *civil* jury trials." (*Ibid.*, italics added.) We are not persuaded that the provision barring blanket policies of time limits for voir dire applies more broadly than the remainder of the text in that section. This is especially true in light of the fact that the next section of the code explicitly addresses voir dire in criminal trials and provides that "[t]he court may, in the exercise of its discretion, limit the oral and direct questioning of prospective jurors by counsel. The court may specify the maximum amount of time that counsel for each party may question an individual juror, or may specify an aggregate amount of time for each party, which can then be allocated among the prospective jurors by counsel." (Code Civ. Proc, § 223.)

14

The trial court required all of these jurors to answer the questionnaire, asked follow-up questions to inquire about the jurors' affirmative answers in the questionnaire, allowed the attorneys to ask questions, albeit for a relatively short time, and asked if the jurors would have answered yes to any of the questions Asbury's attorney had asked the other jurors. This procedure was not perfect, but in the absence of evidence suggesting that one of the jurors who decided the case was biased, it was not sufficiently flawed to require reversal.

### C.    *Intimate Partner Battering*

Asbury contends that the trial court erred by denying her motion for a new trial on the basis that she received ineffective assistance of counsel, in that her trial attorney failed to investigate and bring forward a defense based on intimate partner battering. We disagree.

Because we have already conditionally modified the judgment due to the erroneous jury instructions, offering the prosecution the option either to retry Asbury for second degree murder, or to accept a modification of the judgment to reflect a conviction for voluntary manslaughter (see Discussion part I.A, *ante*), we need not consider whether Asbury's claim of ineffective assistance of counsel would also require the same result. For this reason, we consider Asbury's claim of ineffective assistance only to the extent that it would require reversing her conviction outright. In her motion for new trial Asbury claimed that she had suffered psychological trauma as a result of years of abuse at the hands of Simiele, and that her trial attorney had been deficient in failing to investigate this issue and use it for her defense. In support of this claim, she included affidavits from her trial counsel, her former psychiatrist, a psychologist, and another criminal lawyer. The trial court denied the motion, finding that Asbury's trial counsel had sound tactical reasons not to introduce the evidence, and that much of the support for the psychologist's statement was based on facts that would not have been admissible at trial.

In order to prevail on a claim of ineffective assistance of counsel, a defendant must establish, first, that her attorney's performance was deficient, and second, that

15

those errors prejudiced her. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) In this case, even if we assume that Asbury's counsel was deficient, her claim of ineffective assistance fails because she cannot show a reasonable probability that she would have achieved a better result if not for the error.

A person acts in perfect self-defense if she both subjectively believes that her action is necessary to defend herself from imminent peril to life or great bodily injury, and if that belief is objectively reasonable. (*People v. Jaspar* (2002) 98 Cal.App.4th 99, 106.) She acts in imperfect self-defense if her belief in the need to defend herself is not objectively reasonable. (*Ibid.*) Perfect self-defense completely exonerates a defendant from a murder charge, while imperfect self-defense reduces murder to manslaughter. (*People v. Valencia* (2008) 43 Cal.4th 268, 287.) Because we have already overturned Asbury's murder conviction, we analyze her claim of ineffective assistance of counsel only to determine whether there is a reasonable probability that her attorney would have been able to establish a defense of perfect self-defense if he had acted in the way Asbury contends he should have.

Under Evidence Code section 1107, "[i]n a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence." (*Id.*, subd. (a).) We assume for the purpose of evaluating Asbury's claim of ineffective assistance of counsel that all of the material in the affidavits that Asbury's psychiatrist and expert psychologist submitted would have been admissible under Evidence Code section 1107

if offered at trial.**8**  Evidence of intimate partner battering is relevant to perfect self-defense because when considering the question of reasonableness, "a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .' (CALJIC No. 5.50.)  It judges reasonableness 'from the point of view of a reasonable person in the position of defendant . . . .' " (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082-1083 (*Humphrey*).)

In *Humphrey*, our Supreme Court explained how evidence of intimate partner battery could render reasonable a defendant's fear of harm.  "As violence increases over time, and threats gain credibility, a battered person might become sensitized and thus able reasonably to discern when danger is real and when it is not.  '[T]he expert's testimony might also enable the jury to find that the battered [woman] . . . is particularly able to predict accurately the likely extent of violence in any attack on her.  That conclusion could significantly affect the jury's evaluation of the *reasonableness* of defendant's fear for her life.' " (*Humphrey*, *supra*, 13 Cal.4th at p. 1086.)  In this case, however, there was relatively little evidence that Simiele was physically violent toward Asbury, and no evidence at all of a pattern of violence that allowed Asbury to perceive danger from Simiele that an ordinary observer would have missed.  In her statements to the defense's expert psychologist, Asbury described only two occasions when Simiele had been violent toward her.  Once, more than 20 years before the shooting, he threw a table across the room when Asbury told him she wanted to have an abortion.  On another occasion, Asbury said that Simiele kicked her in the back and rear end when Asbury drank Simiele's beverage.  The psychologist concluded that "there was not much actual physical violence over this long relationship."  Although Asbury claimed that Simiele had been emotionally abusive, cruel, and distant on numerous occasions, those allegations would not have helped convince a jury that she reasonably believed she was at imminent risk of death or great bodily injury at Simiele's hands.

---

**8**  If Asbury's case is retried, and if Asbury's counsel elects to present evidence of intimate partner battering, our decision should not be viewed as determining the admissibility of that evidence.

D.     *Prosecutorial Error*

Asbury contends that the prosecution committed misconduct by making statements during closing arguments that diluted the prosecution's burden of proof. We disagree.

During closing arguments, the prosecution made the following statements while discussing the definition of proof beyond a reasonable doubt: "Now, it's kind of circular but that's exactly what it means. When you are looking at the evidence and coming to a conclusion, is there a reasonable doubt in your mind[?] You look at it and go, um, there is a reasonable explanation that's different than what the prosecution is putting forth. There is a reasonable explanation for the actions that were done in this case. But if not, if not reasonable, then it has been proven to you beyond a reasonable doubt." Asbury's attorney did not object to this statement.

" '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' [Citations.] To establish such error, bad faith on the prosecutor's part is not required. [Citation.] '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666–667 (*Centeno*).)

Asbury forfeited any claim regarding the prosecution's statements by failing to object to them at trial. (*Centeno*, *supra*, 60 Cal.4th at p. 674.) Furthermore, Asbury fails to show that her trial counsel provided ineffective assistance by failing to object. Asbury is correct that "[i]t is . . . error to state that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' " (*Id.* at p. 673.) But that is not what happened here. The prosecution did not state or imply that Asbury bore the burden of proving an explanation different from the one the prosecution had offered. Nor did the prosecution "impl[y] that the People's burden was met if its theory was 'reasonable' in light of the facts supporting it." (*Id.* at p. 671.) Instead, the prosecution in this case asked the jury whether any *other* version of events, apart from "what the

18

prosecution is putting forth," was reasonable. If not, then the prosecution had met its burden.

At most, the prosecution's remark was ambiguous. If it did imply a shift in the burden of proof, it was harmless. "The jury received accurate standard instructions that the People bore the burden of proving defendant guilty beyond a reasonable doubt, and that he was presumed innocent until proven guilty. [Citations.] No instruction stated or implied that defendant bore any burden of proof or persuasion." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1215 [holding that the defendant failed to show that his attorney's failure to object prejudiced him], superseded by statute on another ground, as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.)

II.     *The Habeas Corpus Petition*

In addition to her direct appeal, Asbury has filed a petition for a writ of habeas corpus, in which she alleges that her conviction must be reversed because her attorney rendered ineffective assistance of counsel in several respects. First, Asbury contends that trial counsel should have requested three self-defense pinpoint jury instructions. Next, she contends that her attorney rendered ineffective assistance by failing to object to improper character evidence regarding both Simiele and herself. Finally, Asbury reiterates the argument she raised on direct appeal regarding intimate partner battery. We find no merit to these arguments and deny the petition.

A.     *Pinpoint Instructions*

We have explained the legal principles of a claim for ineffective assistance of counsel above, in part I.C above, and we will not repeat them here. The trial court is required to instruct the jury sua sponte only on general principles of law governing the case. Our Supreme Court has " 'suggested that "in appropriate circumstances" a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case. . . . [Citations.] But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation].' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 500.)

19

### 1. *Self-Defense in the Home*

The trial court gave the jury several instructions dealing with self-defense. Most notably, the court instructed the jury pursuant to CALJIC No. 5.12, as follows: "The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes:

"1. That there is imminent danger that the other person will either kill her or cause her great bodily injury; and

"2. That it is necessary under the circumstances for her to use in self-defense force or means that might cause the death of the other person for the purpose of avoiding death or great bodily injury to herself."

Asbury contends that her attorney was deficient in failing to request three additional instructions: CALJIC Nos. 5.40, 5.42, and 16.531. CALJIC No. 16.531 defines aggravated trespass as "enter[ing] or remain[ing] in any . . . residential place while a resident . . . is present" "without the consent of the owner." According to Asbury, this instruction would have allowed the jury to infer that Simiele committed aggravated trespassing when he remained in Asbury's house after Asbury told him to leave.

CALJIC No. 5.40 deals with the use of force to eject a trespasser from property. It provides that "[t]he lawful owner of a residence on real property has the right to request a trespasser to leave the premises. If the trespasser does not do so within a reasonable time, the owner may use reasonable force to eject the trespasser.

"The amount of force which may be used to eject the trespasser is limited by what would appear to a reasonable person, under the existing circumstances, to be necessary to prevent damage to the property or physical injury or death to the owner."

CALJIC No. 5.42 addresses the right to eject an intruder by force: "A person may defend her home or dwelling against anyone who manifestly intends or endeavors in a violent or riotous manner, to enter that home or dwelling and who appears to intend violence to any person in that home or dwelling. The amount of force which the person may use in resisting the trespass is limited by what would appear to a reasonable person,

20

in the same or similar circumstances, necessary to resist the violent or unlawful entry. She is not bound to retreat even though a retreat might safely be made. She may resist force with force, increasing it in proportion to the intruder's persistence and violence if the circumstances which are apparent to the homeowner of the property are such as would excite similar fears and a similar belief in a reasonable person."

Asbury argues that these instructions were necessary to establish that she had the right to pull her gun and point it at Simiele in an attempt to force him to leave her house. The prosecution argued to the jury that Asbury could not claim self-defense if she was the aggressor.[9] Without instructions on the use of self-defense within one's home, Asbury argues, it was essentially impossible for her to convince the jury that she had not been the aggressor.

Asbury's claim of ineffective assistance of counsel fails because, even if her attorney was deficient in failing to request these instructions, any error was harmless under the *Strickland* standard. (See *Strickland*, *supra*, 466 U.S. at p. 694 [To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."].)

Even under Asbury's account, there was slender evidence for applying the proposed instructions to her case. CALJIC No. 5.42 is entirely inapplicable to Asbury's case because Simiele did not "manifestly intend[] or endeavor[] in a violent or riotous manner, to enter [her] home." As Asbury described the events to the police, Simiele knocked loudly on her door, and she opened the door and allowed him to enter. There was no suggestion that Simiele had invaded her home.

---

[9] The trial court instructed the jury about self-defense by an aggressor through CALJIC No. 5.54, which states that "[t]he right of self-defense is only available to a person who initiated an assault, if" she has tried to refuse to continue fighting, and has told her adversary that she wants to stop fighting and has stopped fighting.

CALJIC No. 5.40 is at least relevant to Asbury's account of her actions. If, as Asbury claimed in her interview with the police, Simiele remained in her home after Asbury had told him to leave, he was guilty of trespassing. (See § 602.5, subd. (b).) CALJIC No. 5.40 does not, however, give a homeowner carte blanche to take any action to eject a trespasser from her home. Instead, it states that a homeowner may use "reasonable force," which is the amount of force that "would appear to a reasonable person, under the existing circumstances, to be necessary to prevent damage to the property or physical injury or death to the owner." (*Ibid.*)

But there was very little evidence to support the conclusion that a reasonable person in Asbury's position would have believed it was necessary to point her gun at Simiele and fire it in order to protect herself from injury or death. In her interview with the police, Asbury's primary emotion toward Simiele appears to have been anger and irritation, not fear. She described receiving only one explicit threat from Simiele, but it was not of imminent harm. She said that Simiele "start[ed] saying something about . . . meeting me . . . in the street . . . and something about fighting . . . and bring your tough guy friends." In other words, Simiele was not threatening to attack Asbury at that moment, but rather trying to arrange a street fight between Simiele and Asbury's friends, presumably at some later point in time. Asbury said she felt "uncomfortable" about Simiele picking up the hammer, but he no longer had the hammer when she drew her gun on him. She told the police that she pulled out her gun not because she felt a need to protect herself, but because she was looking for the remote control. Then she pointed the gun at him and told him he had to leave. Simiele pointed at her, took one step forward, and Asbury shot him.

In light of this evidence, there is no reasonable probability that Asbury would have been acquitted if her attorney had asked for a jury instruction on the use of force inside one's home. (See *Strickland*, *supra*, 466 U.S. at p. 694.)

## 2. *Brandishing a Weapon in Self-Defense*

Asbury contends that her attorney was deficient for not requesting instructions regarding the relative level of misconduct between herself and Simiele prior to the shooting. According to Asbury, her attorney should have requested an instruction informing the jury that Simiele was guilty of misdemeanor aggravated trespassing, in violation of section 602.5, subdivision (b), when he remained in her house after she told him to leave. Asbury argues that her attorney should have also requested an instruction telling the jury that brandishing a weapon is lawful when done in self-defense, and is otherwise a misdemeanor. According to Asbury, these instructions would have assisted the jury in measuring the reasonability of Asbury's use of force in response to Simiele's threat. Without the instruction, "the jury had no way of knowing the relative seriousness of the acts by [Asbury] and Simiele under relevant legal standards."

We are not persuaded. We agree that the amount of force a person may use in ejecting a trespasser is proportional to the degree and imminence of the danger the person faces. (*People v. Corlett* (1944) 67 Cal.App.2d 33, 52 disapproved of on other grounds by *People v. Carmen* (1951) 36 Cal.2d 768, 775.) But Asbury has cited no case law indicating that the Penal Code's classification of a crime as a felony or misdemeanor is determinative of the amount of force it implies, or the danger it represents. We see no basis for concluding that Asbury's proposed instructions would have been appropriate or helpful to the jury.

## 3. *Physical Handicaps*

Asbury contends that her attorney should have requested an instruction informing the jury that it must consider Asbury's physical handicaps when deciding whether Asbury's belief in the need to use deadly force against Simiele was objectively reasonable.

The trial court instructed the jury that, in order for a defense of perfect self-defense to apply, "the circumstances must be such as would excite the fears of a reasonable person placed in a similar position." According to Asbury, her attorney should have gone further and requested an instruction stating that the jury should

23

consider her physical impairment when considering what a reasonable person in her position would have felt. Asbury's doctor testified at trial that her breast cancer surgery and chemotherapy had partially disabled her, so that after the surgery she could lift no more than five pounds. He also stated that she suffered from osteopenia, a softening of the bones, along with chronic low back pain and hip and shoulder pain. In her interview with the police, Asbury stated that she had difficulty lifting heavy objects and walking up flights of stairs.

We need not decide whether Asbury's attorney was deficient in this regard, because it could not possibly have prejudiced Asbury. (See *Strickland*, *supra*, 466 U.S. at p. 694.) An instruction on Asbury's physical condition was relevant only to show that Asbury's fear of imminent harm from Simiele was reasonable. In order for Asbury to have acted in self-defense, however, she also needed to believe subjectively that her life was in imminent danger. (*People v. Jaspar*, *supra*, 98 Cal.App.4th at p. 106.) In convicting Asbury of murder, the jury rejected not only her claim of perfect self-defense, but also imperfect self-defense. The only difference between the two defenses is that perfect self-defense includes an objective component—the requirement of a subjective belief of imminent harm is identical in both types of self-defense. (*Ibid.*) When the jury convicted Asbury of murder, it rejected her claim of imperfect self-defense, necessarily implying that the jurors did not believe she had a subjective belief that her life was in danger. Regardless of any instruction regarding the reasonableness of her fear, therefore, the jury would still have rejected Asbury's claim of perfect self-defense.[10]

###   B.   *Character Evidence*

Asbury contends that her attorney rendered ineffective assistance of counsel by failing to object to the prosecution's introduction of inadmissible evidence of her bad character and Simiele's good character. We disagree.

---

**10** Asbury argues that an instruction on Asbury's disabilities would have been relevant to a claim of imperfect self-defense, but she cites only caselaw pertaining to the objective reasonableness requirement, and she does not explain how an instruction pertaining to the objective requirement would have affected the jury's determination of her subjective belief.

Under Evidence Code section 1101, subdivision (a), in most instances, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." There are several exceptions to this rule, however. Most relevant for this case, Evidence Code section 1103 allows the defendant to prove "conduct of the victim in conformity with the character or trait of character" (*id.*, subd. (a)(1)), and allows the prosecution to introduce evidence to rebut the defendant. (*Id.*, subd. (a)(2).)

1.     *Evidence of Simiele's Good Character*

During redirect examination, the prosecution asked Asbury's friend Patricia Love, "And you knew Anthony. You had met him. Was he a violent man?" Love answered, "I didn't see him be violent." The prosecutor continued, "In your interactions with him what was his personality?" Love answered, "Easy going, outdoor guy."

Asbury contends that this testimony constituted improper good character evidence in violation of Evidence Code section 1101, subdivision (a), and that the exception for rehabilitation of the victim's character pursuant to Evidence Code section 1103, subdivision (a)(2) does not apply because she did not attack Simiele's character. This claim misconstrues the record. The defense made evidence of Simiele's character relevant by questioning Love during cross-examination about his history of violence. Asbury's attorney asked Love if Asbury had ever told her that Simiele had threatened Asbury, and Simiele responded in the affirmative. Love also recalled that Asbury had told her that Simiele once head-butted their daughter, and that he had a history of drinking. By questioning Love about Simiele's character, Asbury opened the door to the prosecutor's attempt to rehabilitate him during redirect examination. (*People v. Walton* (1996) 42 Cal.App.4th 1004, 1014-1015, disapproved on other grounds by *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3.)

## 2. *Evidence of Asbury's Bad Character*

Simiele's girlfriend Mary Huang testified that Asbury came to Simiele's house, where she and Simiele were preparing to eat dinner on Easter Sunday, and argued with Simiele. Huang testified that Simiele told Asbury, "Diane, when [the couple's daughter] Victoria was sick, you held a gun to your head, and held it to Victoria's head. And Victoria was crying on my lap. I was sitting on the bedside. She is my daughter. Leave my daughter alone." Asbury's attorney objected to the testimony on the ground of hearsay, but did not object on the basis that the testimony was inadmissible bad character evidence.

Asbury contends that this testimony was inadmissible under Evidence Code section 1101, subdivision (a). We disagree. Section 1101, subdivision (b) allows for the admission of a defendant's prior bad acts in order to prove the defendant's motive or intent for committing the offense with which she is charged. In this case, the central question of the trial was Asbury's motive or intent in drawing and firing her gun. The testimony regarding the prior occasion in which she pointed a gun at herself and her daughter showed that she was capable of pulling a gun not because her life was at risk, but because she was in the midst of an emotional family crisis. Although it is true that in that earlier instance she did not fire the gun, her willingness to brandish it and point it at a family member was probative of her motive and intent in pulling it and brandishing it at Simiele.

## C. *Intimate Partner Battering*

Asbury reiterates the argument she made in her direct appeal with regard to intimate partner battering. In her habeas petition, she also attaches a declaration and a report from the expert psychologist who filed an affidavit with her petition for a new trial. We perceive nothing in these documents that causes us to reconsider the conclusion we reached regarding this issue in the direct appeal. (See Discussion part I.C, *ante*.)

D.    *Cumulative Prejudice*

Asbury contends that, even if individual instances of ineffective assistance were insufficiently prejudicial to warrant granting her petition, the cumulative prejudice of her attorney's errors require us to overturn her conviction.  We have rejected two of Asbury's arguments on the basis of harmless error: first, her contention that her attorney was deficient for failing to request jury instructions on the use of force to eject a trespasser, and second, her contention that he should have requested an instruction on the application of the reasonable-person standard to a defendant who is physically disabled.  Even if Asbury's attorney fell below the standard of care with respect to these issues, an issue we need not and do not resolve, the errors together did not cumulatively prejudice her.

**DISPOSITION**

The judgment of the trial court is reversed. On remand, the prosecution shall have the option to retry Asbury for second degree murder, or to accept a modification of the judgment to reflect a conviction for voluntary manslaughter. If the prosecution elects to accept the modification of the judgment, the trial court shall resentence Asbury in accordance with the modified judgment.

                                                    ROTHSCHILD, P. J.

We concur:


            CHANEY, J.


            JOHNSON, J.

28

## JUROR QUESTIONNAIRE

**Instructions:**

**Please do not write on the questionnaire.**

**Read each question and note the question number to which you have a positive response.**

1. **What is the general area of your residence? How long have you lived in that area?**

2. **What is your occupation?**

3. **What is your marital status?**

4. **What is your spouse's occupation?**

5. **How many children do you have?**

   a.  **If you have any adult children, what are their occupations?**

6. **Have you had previous jury experience?**
   a.  **How many times**
   b.  **Criminal or civil?**
   c.  **Did you reach a verdict?(Simply answer "yes" or "no" – do not tell us whether it was a "guilty" or "not guilty" verdict)**
   d.  **If it was a criminal case, what were the charges against the defendant?**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

7. **Have you, or a family member, or a close friend had any training in or been involved in law enforcement?**

8. **Do you or any of your relatives/ close friends have any legal training or experience?**

9. **Would the fact that witness is a member of law enforcement cause you to automatically believe or disbelieve his or her testimony?**

10. Have you or anyone close to you had any contact with law enforcement either of a positive or negative nature(Including traffic tickets), that might influence you in this case?

11. Do you have any friends or relative who have contact with the criminal justice system? (E.g. Prosecutors, criminal defense attorneys, judges, courtroom staff.)

12. Have you or any member of your family or close personal friends ever been the victim of a crime?

13. Have you, or any member of your family, or any close personal friends ever been arrested, charged with a crime or ever been convicted of a crime?

14. Have you, or any member of your family, or close personal friends ever been a witness in a criminal case?

15. Will you have any difficulty in following the law as given to you by the judge, even if you may disagree with it?

16. Are you acquainted with the prosecutor, the defense attorney, the defendant, any of the courtroom staff, or any of the witnesses mentioned?

17. Is there anything about the nature of these charges that would make you favor one side or the other or which might make it difficult for you to sit as a juror in this matter?

18. Do you belong to any group/organization which takes a strong stand on issues related to the charges in this case?

19. Do you disagree with any rule of law or legal principle that was discussed during voir dire?

20. Can you think of any reason why you could not arrive at a fair and impartial verdict in this matter?

Filed 11/2/16

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DIANE C. ASBURY,<br><br>    Defendant and Appellant. | B255953<br>(Los Angeles County<br>Super. Ct. No. MA052970) |
| In re DIANE C. ASBURY,<br><br>        on Habeas Corpus. | B269063<br><br>CERTIFICATION AND ORDER FOR<br>  PUBLICATION |

The opinion in the above-entitled matters filed October 4, 2016, was not certified for publication in the Official Reports. For good cause, and pursuant to California Rules of Court, rules 8.1100 and 8.1110, it now appears that the opinion should be partially published in the Official Reports with the exception of parts I.A, I.C, I.D and II of the Discussion.

_____

  ROTHSCHILD, P. J.          CHANEY, J.          JOHNSON, J.