Filed 12/26/24  P. v. Adams CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUSTIN CHRISTOPHER ADAMS,<br><br>    Defendant and Appellant. | 2d Crim. No. B331421<br>(Super. Ct. No.  23CR01423)<br>(Santa Barbara County) |

Justin Christopher Adams appeals the judgment after a jury convicted him of assault by means of force likely to produce great bodily injury (Pen. Code,[1] §§ 245, subd. (a)(4); count 1) and battery with serious bodily injury (§ 243, subd. (d); count 2).  As to count 1, the jury found true the allegation that Adams caused great bodily injury.  (§ 12022.7, subd. (a).)  The trial court found true that Adams suffered a prior strike conviction (§§ 667, subds.

---

[1] Further unspecified statutory references are to the Penal Code.

(d)(1) & (e)(1); 1170.12, subds. (b)(1) & (c)(1)) and a serious prior felony (§ 667, subd. (a)(1)).  The court sentenced him to nine years in state prison.

Adams contends the trial court erred by imposing unreasonable time limits on jury voir dire, admitting evidence of two prior bad acts, and denying his motion to dismiss his prior strike.  We affirm.

FACTUAL AND PROCEDURAL HISTORY

Tristin Bartlett was a security guard for a private company.  He was patrolling an area in Isla Vista when he contacted Adams and his girlfriend, Jenna Bennett, who were sleeping under a gazebo in a park.  Bartlett told them, "You need to pack up your shit, and you need to go."  Adams "became very aggressive, got up, . . . and started cussing, yelling, threatening."  Adams threw a shoe at Bartlett.  Bartlett then attempted to pepper spray Adams, but the spray malfunctioned.

Bennett began yelling at Bartlett.  She said Bartlett told her, "Shut up or I'll spray you, too."  Adams then "rushed" Bartlett, punched him in the jaw, and tackled him to the ground.  Adams pinned Bartlett stomach-down on the ground and placed him in a headlock.  Adams repeatedly said, "You're done."  Bartlett managed to flip Adams on his back and placed him in a chokehold.  Bartlett released Adams after he indicated he was "going to stop."

Bartlett called the police.  He had visible injuries to his face, appeared to be in pain, and seemed "shaken up."  A CT scan revealed Bartlett's jaw was fractured.  He required oral surgery to remove an impacted wisdom tooth and his jaws were wired together for about six weeks.

2

At trial, the prosecution presented evidence of two prior bad acts—Adams's prior conviction in 2012 for aggravated assault with a deadly weapon (a knife) in Texas and an uncharged assault in 2019. The evidence was proffered for the limited purpose of proving motive, knowledge, lack of mistake, or accident. The court gave a limiting instruction. The prosecution presented certified records of Adams's 2012 conviction, which showed that he pleaded guilty to "intentionally or knowingly caus[ing] bodily injury to [a person] by stabbing or cutting him with a knife" and using a knife in the manner "capable of causing death or serious bodily injury." As to the 2019 offense, the prosecution called Steven Goodvin to testify about an incident in which he got into an argument with Adams over a bicycle and Adams punched him in the jaw. Goodvin said he did not threaten Adams. Adams broke Goodvin's jaw, requiring emergency surgery.

The jury found Adams guilty on both counts and found the great bodily injury allegation true. The trial court denied Adams's *Romero*[2] motion to dismiss his prior strike. It sentenced him to nine years in state prison, consisting of six years on count 1 (the middle term of three years double for the prior strike) and a consecutive three years for the great bodily injury enhancement (§ 12022.7, subd. (a)). The court stayed punishment on count 2 pursuant to section 654 and stayed the serious prior felony enhancement (§ 667, subdivision (a)).

---

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.)

## DISCUSSION

### *Jury voir dire*

Adams contends the trial court violated his Sixth Amendment right to a fair and impartial jury when it imposed unreasonable time limits on jury voir dire. We conclude otherwise.

### *1. Relevant background*

At a pretrial hearing, the trial court advised the parties that it intended to give the parties 30 minutes on their initial challenges for cause and then 15 minutes for each additional round of voir dire. The court also told the parties, "I'll also give you the opportunity if you need an extra five minutes, you can ask me for more time during any one of those, and I'm happy to consider giving that [too]. [¶] And as long as you're being efficient and . . . things are going smoothly, I'm happy to give you time." The court clarified the parties would have "over an hour in total" for voir dire and that it would take other factors into consideration for extra time allowances.

### *a. First round of voir dire*

Jury voir dire began on July 5, 2023. Before jury selection, the trial court provided a questionnaire to prospective jurors. After the first group of 18 prospective jurors were selected, the court asked follow-up questions to anyone who answered "yes" to any of the questionnaire. Both parties then had an opportunity to ask questions subject to the time restrictions.

Defense counsel asked questions regarding homelessness, security guards, and self-defense/defense of others. When counsel's 30 minutes expired, the trial court allowed counsel to continue questioning a juror. The prosecutor then used her 30 minutes to ask the panel about witness credibility, self-defense,

4

security guards, and bias.  The court gave the prosecutor "the same extra two minutes" it gave defense counsel.

The trial court heard the parties' challenges for cause outside the presence of the jurors.  Defense counsel challenged three jurors for cause, two of which were stipulated to by the prosecution.  The court denied the three cause challenges because it had "not heard enough" to excuse the jurors, and would allow the parties to ask them additional questions.  Defense counsel replied, "I also do not think we're getting enough time from Your Honor.  I think that the reason we've not been able to follow up is because there's not enough time."  The court responded, "I think there's different ways of conducting voir dire, and when you have a time limit, it just frames the questions in a different manner."

The prosecutor then challenged one juror for cause, which the court denied.  The court said, "And the next round, if you ask it, when I say five minutes left, if you ask me for another five minutes, I will most likely grant your request.  But I'm not going to give an unlimited hours after hours of examination, but if you ask for more time, I will certainly consider it and most likely give you extra time when you ask for it."

Defense counsel again argued, "I believe that . . . currently there is an inflexible or arbitrary time limit."  The court responded, "Well, as I told you, you can ask for more time.  I gave you an extra two minutes and you didn't ask for any extra time.  So there's no inflexible policy.  Had you asked me for more time, I would have given you more time.  But you didn't ask for any."

b.  *Second round of voir dire*

When the jury returned, the parties exercised their peremptory challenges, including one to excuse a juror the defense had unsuccessfully challenged for cause.  The court called

seven more jurors to the panel.  After the trial court asked the new prospective jurors some questions, the attorneys had 15 minutes each to ask questions.  The court reminded the attorneys, "if you'd like to ask for more time, go right ahead."

Defense counsel asked the new prospective jurors some questions and also asked one juror from a previous round follow-up questions.  Counsel requested more time, which the court granted.  The prosecutor was also given 20 minutes for questioning.

### c.  Third round of voir dire

The next day, defense counsel again argued there were unreasonable time limits in voir dire.  Counsel asserted that because of the court's denial of the for cause challenge to a juror, counsel used a peremptory challenge they would not have otherwise used.  The prosecutor agreed, arguing that "[b]oth sides are not getting a fair trial, given that we cannot question the jurors in detail."  The trial court denied these arguments and concluded the parties were receiving a fair trial.  The court reasoned, "We've had all day to conduct voir dire yesterday. Defense has had 52 minutes of questioning.  People have had 52 minutes of questioning.  We're not finished with voir dire.  By the time we're finished, both sides will have had over an hour of questioning, in addition to the Court's multiple hours of questioning.  That is far and above any—any discretionary terms, length."

Defense counsel challenged another juror for cause, and the court granted the request.  After another round of peremptory challenges, the court called more jurors to the panel, and the court and parties questioned the new jurors.  When defense

6

counsel's 20 minutes elapsed, the court allowed two extra minutes.

### d. Fourth round of voir dire

The court excused one juror for cause. The defense used three additional peremptory challenges, including two to dismiss jurors unsuccessfully challenged for cause. The court called additional jurors to the panel, who were questioned by the court and the parties. The court gave defense counsel 25 minutes for questions. Defense counsel asked the jurors whether Adams's prior conviction would have an impact on their ability to fairly assess the facts. The following colloquy occurred between defense counsel and juror number 7:

"[Juror number 7]: . . . I think that . . . it would affect my opinion of how I'm feeling about Mr. Adams, probably, and that could . . . affect how I would end up viewing the situation that he was in . . . if the rules were to not [allow] that, I feel like I could separate it. But I worry I wouldn't be able to. I worry it would tinge my opinion of Mr. Adams, and therefore, it would affect how I view everything he did. I worry that I wouldn't be able to separate out past actions from who he is now. [¶] . . .[¶]

"[Defense counsel]: So even if the Judge were to give you an instruction to say otherwise, . . . would your gut tell you, "I still—it's hard for me to keep these two things separate right now"?

"[Juror number 7]: I would hope I would be able to follow an instruction to disregard that. But again, it's hard . . . for me to know if that would be tinging my current opinion. Like I could

7

assume an opinion I'm currently having is formed purely by the facts and the current situation. But that opinion is obviously tinged by whatever I know about Mr. Adams. [¶] . . .[¶]

"I assume that's a normal situation to be in, where . . . everything we view or have opinions on is in some way tinged by experience . . . . I would hope I'd be able to separate them, . . . but I can't guarantee that because I don't really know how my mind works."

When defense counsel asked if there was anyone concerned about whether they could be fair and impartial, juror number 7 said, "[T]o the implicit bias point, I think I can. But . . . I don't know what I don't know about myself. . . . I would try to strive to be the fair juror I imagine I would want."

Jurors number 8 and 10 also agreed that they did not know if they could be fair and impartial because of implicit bias, but they indicated they would do their "best." During the prosecutor's questioning, jurors number 7, 8, and 10 indicated they could follow the judge's instructions.

Defense counsel challenged jurors number 7 and 10 for cause. The trial court denied the challenges, noting they indicated they could follow the court's instructions. Defense counsel used their last peremptory challenge to excuse juror number 12. Juror number 7 was seated.

Outside the presence of the jurors, the trial court stated for the record that it "complied with Code of Civil Procedure Section 223. The Court set a reasonable time limit. The Court was flexible. The Court granted every request for additional time. The Court provided the timelines before trial, advised both

8

counsel that they could ask for additional time. Only one time . . . counsel asked for additional time, and the Court granted that." The court further stated, the "voir dire lasted over almost two complete days, consisting of over eight hours of court time. Only 38 jurors were interviewed. The Court granted 135 minutes to both sides. The defense did not use 1 minute and 30 seconds they had remaining . . . . The People had 5 minutes and 30 seconds . . . that were unused." The court also noted it provided questionnaires to the jurors and conducted "substantial voir dire for hours to provide more information to both sides." The court also reviewed Code of Civil Procedure section 223, subdivision (c) and noted "the defense only requested one additional time that was granted by the Court. The trial does not present any unique or complex legal items or factual elements. It's a simple case with simple charges. The length of the trial is short in duration. . . . [I]t's a one-defendant case. And the number of witnesses is also low. . . . [T]he Court's allocation of time is appropriate based on the facts of this case."

### 2. *Analysis*

A criminal defendant has a right to an impartial jury. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) Code of Civil Procedure section 223 governs jury voir dire and provides that after the trial court's initial questioning, "counsel for each party shall have the right to examine, by oral and direct questioning, any of the prospective jurors. The scope of the examination conducted by counsel shall be within reasonable limits prescribed by the trial judge in the judge's sound discretion . . . . During any examination conducted by counsel for the parties, the trial judge shall permit liberal and probing examination calculated to discover bias or prejudice with regard to the circumstances of the

9

particular case or the parties before the court." (*Id.*, subd. (b)(1).) "The trial judge shall not impose specific unreasonable or arbitrary time limits or establish an inflexible time limit policy for voir dire. As voir dire proceeds, the trial judge shall permit supplemental time for questioning based on individual responses or conduct of jurors that may evince attitudes inconsistent with suitability to serve as a fair and impartial juror in the particular case." (*Id.*, subd. (b)(2).)

In exercising its "sound discretion," the trial judge shall consider: (1) The amount of time requested by trial counsel, (2) any unique or complex legal or factual elements in the case, (3) the length of trial, (4) the number of parties, and (5) the number of witnesses. (Code Civ. Proc., § 223, subd. (c).) The trial court "has a duty to restrict voir dire within reasonable bounds to expedite the trial." (*People v. Avila* (2006) 38 Cal.4th 491, 536.) It has "considerable discretion in 'the manner in which voir dire is conducted.' " (*People v. Debose* (2014) 59 Cal.4th 177, 194.) We review a trial court's limitations on voir dire for abuse of discretion. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1246.)

In our view, the trial court did not abuse its discretion in imposing time limits on voir dire. For each panel of prospective jurors, the trial judge provided a questionnaire and conducted the initial examination of the prospective jurors "to provide more information to both sides." (See *People v. Leon* (2015) 61 Cal.4th 569, 589 (*Leon*) [no abuse of discretion in setting time limits where oral questioning was brief, but, combined with the jury questionnaire, gave the defendant adequate information to make informed decisions on peremptory or for cause challenges].) After the initial examination by the court, the court granted both parties 30 minutes for the first round of voir dire and about 20

10

minutes for each subsequent round. In total, it granted 135 minutes per side for voir dire. Jury selection lasted almost two full days with four panels of prospective jurors.

The record reflects the trial court's time limits were not capricious. It repeatedly told the parties that if they needed more time, they could request it, and the court would likely grant it. Defense counsel was granted an extra five minutes upon request. The court also granted counsel additional time even though it was not expressly requested. (See *People v. Avila*, *supra*, 38 Cal.4th at p. 536 [the court's "willingness to permit additional time for counsel-conducted voir dire upon a showing of good cause ameliorated any potential concern that the limitation would somehow be unfair or violate the right to an impartial jury"].)

The trial court also considered all the factors under Code of Civil Procedure section 223, subdivision (c) in setting the time limits. The court considered and granted additional time requested by the defense, the case did not present any unique or complex legal or factual elements, the trial was short in length (five days excluding voir dire), it was a "one-defendant case," and the number of witnesses were "low." We conclude the court's time limitations do not fall outside the bounds of reason.

Adams nevertheless contends the time restrictions resulted in the exhaustion of his peremptory challenges and accepting a jury that was not fair or impartial. He asserts that juror number 7, who indicated bias based on Adams's prior conviction, was left on the jury because of the unreasonable time limits. But, as we concluded, the time limits for questioning were not unreasonable, arbitrary, or inflexible. The trial judge allowed sufficient time for the parties to conduct an "examination calculated to discover [a juror's] bias or prejudice." (Code Civ. Proc., § 223, subd. (b)(1).)

11

After each voir dire round, the parties made several challenges for cause, some of which were granted. And, when a challenge for cause was denied, the parties were allowed to ask additional questions with the option for extra time.

Even if the time limitations on voir dire deprived Adams of the ability to fully probe juror 7's purported bias or prejudice, Adams must show such deprivation resulted in a miscarriage of justice. (Code Civ. Proc., § 223, subd. (g).) " 'Unless the voir dire "is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal." [Citations.]' [Citation.]" (*Leon*, *supra*, 61 Cal.4th at p. 589.) Adams contends his trial was fundamentally unfair because juror number 7 remained on the panel. But Adams does not demonstrate juror number 7 was biased. Juror 7 stated they could follow the limiting instruction about prior convictions, stating, "I know I can follow instructions." Voir dire was also adequate as counsel extensively questioned the jurors, including juror 7, regarding Adams's prior conviction and its impact on their ability to fairly assess the facts.

The court rejected Adams's challenge for cause because it found that juror 7 acknowledged their implicit bias and engaged in a "fairly philosophical, hypothetical, kind of academic discussion" of it, but the juror ultimately said they could follow the court's instructions. Adams does not contest the court's ruling on this for cause challenge, nor do we find error in the court's reasoning. Adams also does not suggest any further questioning of juror number 7 was necessary or that he had inadequate time to question them. (See *People v. Asbury* (2016) 4 Cal.App.5th 1222, 1230 [there is no miscarriage of justice if the

12

defendant does not explain what additional questions over and above what he already asked would have ferreted out bias].) Based on this record, we conclude there was no miscarriage of justice.

*Prior bad acts*

Adams further contends the trial court erred when it admitted evidence of Adams's 2012 prior conviction for aggravated assault with a deadly weapon and a 2019 uncharged assault. Even if the court erred, we conclude that any such error was harmless.

A trial court's evidentiary errors do not require reversal unless it is reasonably probable that the defendant would have obtained a different result absent the errors. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Johnson* (2022) 12 Cal.5th 544, 611 (*Johnson*) [admission of uncharged crimes evidence]; *People v. Marks* (2003) 31 Cal.4th 197, 227 [admission of evidence under Evid. Code, § 352].) No such reasonable probability exists here.

The prior bad acts evidence was not a significant part of the prosecution's case. (See *Johnson, supra*, 12 Cal.5th at p. 611.) The evidence of the 2012 prior conviction consisted only of a five-page court record, and the prosecutor did not mention it during closing argument. (See *People v. Jones* (2011) 51 Cal.4th 346, 371 [evidence not unduly prejudicial where the evidence was presented quickly, and the parties did not dwell on it].) The testimony regarding the 2019 uncharged assault on Goodvin and the prosecutor's discussion of the evidence in closing argument was also brief. (*Ibid*.) The prosecution largely focused on Bartlett's testimony as well as the inconsistencies of Bennett's testimony and Adam's self-defense theory.

13

Moreover, the trial court gave a limiting instruction on how the jury could consider the prior bad acts evidence (CALCRIM No. 375), reducing the danger that jurors would be misled.  " 'We must assume, contrary to defendant's theory of prejudice, that the jury obeyed the express language of the instruction not to use the other-crimes evidence to establish defendant's character or his disposition to commit crimes.' [Citation.]" (*Johnson*, *supra*, 12 Cal.5th at p. 612.)

The evidence of Adams's guilt was also overwhelming.  (See *People v. Doolin* (2009) 45 Cal.4th 390, 439.)  The evidence supported the prosecutor's theory that Adams "snapped" and reacted out of anger rather than self-defense.  When Bartlett told him to leave the park, Adams got angry and aggressive.  Bartlett testified that Adams "rushed" him and punched him in the jaw with such force that it broke and required surgery.  Furthermore, evidence that the pepper spray malfunctioned undercut Adams's claim of imminent danger justifying self-defense or defense of others.  Bartlett testified the pepper spray deployed a stream less than a foot in length, and Adams was standing further away.  The deputies also did not detect the odor of pepper spray on Adams nor any visible signs of it on his clothing or eyes.  Accordingly, we find no reasonable probability the verdict would have been more favorable to Adams had the court excluded evidence of the prior bad acts.

### *Senate Bill No. 81*

Adams also contends the trial court should have dismissed his prior strike pursuant to section 1385, as amended by Senate Bill No. 81 (2021-2022 Reg. Sess.).  But Senate Bill No. 81 applies to enhancements, not an alternative sentencing scheme such as the Three Strikes law (§ 1170.12).  (*People v. Burke* (2023) 89

14

Cal.App.5th 237, 242-244.)  We agree with *Burke* and conclude Senate Bill No. 81's amendments to section 1385 do not apply to sentences imposed under the Three Strikes law.  (*Burke*, at pp. 242-244.)

Romero *motion*

Adams contends the trial court erred when it denied his *Romero* motion to dismiss his prior strike for the 2012 aggravated assault conviction.  He contends the trial court did not properly consider all the relevant factors in favor of dismissing the strike, including his mental health issues.  We disagree.

We review a trial court's exercise of discretion to dismiss a prior violent or serious felony conviction for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 374.)  "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."  (*Id.* at p. 377.)  Dismissal of a strike is warranted if "in light of the nature and circumstances of [the] present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit."  (*People v. Williams* (1998) 17 Cal.4th 148, 161.)  We conclude these factors did not mandate dismissal of Adams's prior strike conviction.

The record demonstrates the trial court was aware of its discretion and considered mitigating factors.  The court considered Adams's sentencing brief, the parties' oral arguments, and the probation report.  Adams argued mitigating circumstances, including his mental health issues and childhood trauma, warranted a dismissal of the strike.  The probation report included Adams's criminal history and information about his mental health and substance abuse issues.  It also set forth

15

all the aggravating and mitigating circumstances in this case, and it recommended imposition of the upper term for a total of 16 years. The court found five circumstances in aggravation: that Adams engaged in violent conduct that indicates a serious danger to society, his prior convictions were increasing in seriousness, he served a prior prison term, he was on probation at the time of the offense, and his prior probation was unsatisfactory. (Cal. Rules of Court, rule 4.421(b)(1)-(5).) It found three circumstances in mitigation: that Adams was suffering a mental condition that significantly had an effect on him, there were multiple enhancements alleged in a single case, and his prior conviction was over five years old. (*Id*., rule 4.423(b)(2), (11), (13).) The court remarked that it hoped Adams would "express more remorse and more concern for the victim." In balancing all the circumstances, the court denied the motion to dismiss the strike prior, but stated that it would give Adams "some leniency" by selecting the middle term, staying the five-year prior, and not imposing the requested maximum sentence of 16 years. On this record, we cannot say the court abused its discretion.

Adams contends the strike, which was 11 years old at the time of sentencing, was too remote in time. In considering a *Romero* motion, the court may consider the age of the prior offenses. (*People v. Avila* (2020) 57 Cal.App.5th 1134, 1141.) But remoteness in time is an insufficient basis to dismiss a strike where the defendant has not had "a crime-free cleansing period of rehabilitation" but instead "has led a continuous life of crime after the prior." (*People v. Humphrey* (1997) 58 Cal.App.4th 809, 813 [reversing dismissal of 20-year-old strike]; *People v. Pearson* (2008) 165 Cal.App.4th 740, 749-750 [strikes 24, 15, and 10 years old properly imposed].) Here, after his prior strike conviction,

16

Adams received probation, violated it, and was sent to prison. From 2017 to 2022, he also committed eight misdemeanors. He was also on probation at the time he committed the present offense.

Adams also contends the trial court failed to consider his youthful age (22 years old) at the time he committed the strike offense. But we presume the court considered all relevant factors, even if it did not expressly mention them. (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) Moreover, Adams's youthful age does not constitute an extraordinary circumstance that places him outside the spirit of the Three Strikes law, especially considering his continuous criminal history. (See *People v. Carmony*, *supra*, 33 Cal.4th 378-379.)

Lastly, Adams contends the trial court impermissibly considered lack of remorse as an aggravating factor. However, because Adams did not object at trial, the contention is forfeited. (*People v. Scott* (1994) 9 Cal.4th 331, 353.) But even on the merits, the court's consideration of Adam's lack of remorse was permissible. "In deciding whether to strike a prior felony conviction, a court must consider factors that are intrinsic to the Three Strikes law's sentencing scheme, including the defendant's 'background, character, and prospects,' but it may not consider factors extrinsic to the scheme, like 'the mere desire to ease court congestion or . . . bare antipathy to the consequences for any given defendant.' [Citation.]" (*People v. Nunez* (2023) 97 Cal.App.5th 362, 372.) Here, it appears the court considered Adams's lack of remorse "as relevant to his character, future prospects, and improbability of rehabilitation, not as a result of any sort of antipathy toward [Adams]." (*Id.* at pp. 372-373).

17

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>



BALTODANO, J.


We concur:



GILBERT, P. J.



CODY, J.

18

Michael J. Carrozzo, Judge

Superior Court County of Santa Barbara

_____

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.